## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| SCARLET HONOLULU, INC.; WALTER ENRIQUEZ d/b/a GAY ISLAND GUIDE,<br><br>Plaintiffs,<br><br>vs.<br><br>HONOLULU LIQUOR COMMISSION; DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS; ROBERT AIU, in his official capacity; KRISTEN KIMOTO, in her official capacity; JACOB FEARS, in his official capacity; and CATHERINE FONTAINE, in her official capacity,<br><br>Defendants. | Case No. 21-cv-00457-DKW-KJM<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

In their First Amended Complaint ("FAC"), Plaintiffs Scarlet Honolulu, Inc. ("Scarlet") and Walter Enriquez d/b/a Gay Island Guide ("GIG") (collectively, "Plaintiffs") assert that three Defendants—the Honolulu Liquor Commission ("HLC") and two HLC Investigators, Jacob Fears and Catherine Fontaine, in their official capacities (collectively, "Defendants")[1]—violated Plaintiffs' constitutional

---

[1]The other three named Defendants—the Department of Commerce and Consumer Affairs, Robert Aiu, and Kristen Kimoto—were voluntarily dismissed from this case on February 9, 2023.  Dkt. No. 62.

and other rights via sexual orientation discrimination.  Before the Court is

Defendants' Motion for Summary Judgment ("MSJ") on the FAC's six claims, for

which Defendants contend there are no genuine factual disputes for trial.  As

explained below, Plaintiffs' official capacity claims against Fears and Fontaine are

DISMISSED WITH PREJUDICE because those claims are redundant of Plaintiffs'

claims against the HLC.  Additionally, Plaintiffs' constitutional claims—insofar as

they are based on the assertion of an unconstitutional formal policy and/or

ratification of unconstitutional conduct, *see Monell v. Dep't of Soc. Servs.*, 436

U.S. 658, 691 (1978)—are also DISMISSED WITH PREJUDICE, as is Plaintiffs'

negligent hiring claim.  However, because Defendants have not demonstrated the

absence of a genuine dispute of material fact with regard to any of the remaining

claims against the HLC, the MSJ is DENIED in all other respects.

## LEGAL STANDARD

A court must grant a motion for summary judgment if "the evidence in the

record" and "all reasonable inferences from that evidence," when viewed in the

light most favorable to the non-moving party, show "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir.

2005).  The movant "bears the initial burden of . . . demonstrat[ing] the absence of

a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant carries that burden, then "[t]o survive summary judgment, [the non-movant] must set forth non-speculative evidence of specific facts" showing there is a "genuine issue for trial." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In assessing a motion for summary judgment, all facts and inferences are construed in the light most favorable to the non-moving party.  *Genzler*, 410 F.3d at 636; *Coghlan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).

## PROCEDURAL BACKGROUND

Plaintiffs initiated this action on November 22, 2021, Dkt. No. 1, and followed it by filing the operative FAC on August 15, 2022.  Dkt. No. 50.  The FAC asserts that Defendants "have engaged in an ongoing campaign of unlawful, unconstitutional, and highly discriminatory anti-gay harassment of Scarlet, GIG, and generally, the Honolulu LGBTQ+ community."  *Id.* at 5.  More specifically, the FAC asserts:

> **Count 1:** Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and Article 1, Section 5 of the Hawai'i State Constitution, against the HLC and Fears and Fontaine in their official capacities;
>
> **Count 2:** Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and Article 1, Section 5 of the

Hawaiʻi State Constitution, against the HLC and Fears and Fontaine in their official capacities;

**Count 3:** Violation of Hawaiʻi Revised Statutes ("H.R.S.") § 489-3, against the HLC and Fears and Fontaine in their official capacities;

**Count 4:** Negligent hiring, training, supervision, and retention of employees, against the HLC;

**Count 5:** Claim for injunctive relief, enjoining Fears and Fontaine from continuing rights violations; and

**Count 6:** Claim for injunctive relief, enjoining the HLC from continuing rights violations.

*See id.* at 40–55. A non-jury trial in this matter is currently scheduled for December 5, 2023. *See* Dkt. No. 98 at 1.

On May 5, 2023, Defendants filed the instant MSJ, Dkt. No. 101, along with a concise statement of facts ("DCSF"), Dkt. No. 102. With regard to the official capacity claims against Fears and Fontaine, Defendants contend that those claims should be dismissed as redundant of the claims against the HLC. MSJ at 7. With regard to the claims against the HLC, Defendants contend that the evidence in the record, when viewed in the light most favorable to Plaintiffs, shows an absence of a genuine dispute regarding any material fact, and Defendants therefore assert entitlement to judgment as a matter of law on all counts.[2] *Id.* at 22; Fed. R. Civ. P. 56(a); *Genzler*, 410 F.3d at 636.

---

[2]With no violation under the first four counts, there would be no basis for an injunction under either Count 5 or Count 6. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 506–07 (1959)

On June 16, 2023, Plaintiffs opposed the MSJ, Dkt. Nos. 115, 117–121, and filed both a responsive concise statement of facts ("PRCSF"), Dkt. No. 116 at 2–4, and an additional concise statement of facts ("PACSF").  Dkt. No. 116 at 5–9.[3]  On June 23, 2023, Defendants replied.  Dkt. No. 125.  In doing so, Defendants did not dispute the facts contained in Plaintiffs' PACSF.  *See id.*; LR 56.1(e) ("If [] additional facts are advanced in the opposing party's concise statement, the movant shall file, together with its reply brief, a further concise statement that responds only to those additional facts.").[4]  On July 7, 2023, the Court heard oral argument on these matters, and this Order follows.  *See* Dkt. No. 128.

## FACTUAL BACKGROUND[5]

### I.    Inspection Rate Disparity

The HLC is a local liquor control agency that administers liquor licenses and other regulatory services to Honolulu residents in order to ensure compliance with

---

("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."); *Milliken v. Bradley*, 433 U.S. 267, 279–80 (1977) (injunctive remedy "is to be determined by the nature and scope of [any] constitutional violation").
[3]Also on June 16, 2023, Plaintiffs filed a Motion for Leave to File an Amended Complaint, requesting leave to name Fears and Fontaine in their *individual* capacities.  Dkt. No. 123.  On June 28, 2023, the assigned Magistrate Judge denied the motion, first because Plaintiffs had failed to comply with the Local Rules in so filing, and second because Plaintiffs had failed to establish good cause for the amendment and, more specifically, had failed to show they were diligent in seeking to modify the deadline to amend their pleadings.  Dkt. No. 126.
[4]In failing to file the mandatory further concise statement, Defendants risk admission of all facts contained in the PACSF.  *See* LR 56.1(g) ("For purposes of a motion for summary judgment, material facts set forth in the movant's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party.").
[5]This summary construes all facts and inferences in the light most favorable to Plaintiffs.  *See Genzler*, 410 F.3d at 636; *Coghlan*, 413 F.3d at 1095.

the liquor laws of the State of Hawaii and the Rules of the Liquor Commission. *See* H.R.S. § 281.  In the course of this work, HLC investigators inspect licensees, "to ascertain whether all of the conditions of the license and all provisions of [H.R.S. § 281] are being complied with by the licensee." *See* H.R.S. §§ 281-20, 281-79.[6]  At all times relevant to this lawsuit, Defendants Fears and Fontaine were HLC investigators.

There are approximately 1,500 liquor licensees in Honolulu County. PACSF ¶ 1.  Seven (7) out of the 1,500 licensees, including Scarlet, identify as LGBTQ+ establishments, leaving approximately 1,493 non-LGBTQ+ licensees. *Id.*[7]

In the years 2020 and 2021, LGBTQ+ licensees were inspected by HLC investigators at a higher rate than non-LGBTQ+ licensees.  In 2020, 4,110 inspections were performed across the 1,500 licensees.  PACSF ¶ 4.  The 1,493 non-LGBTQ+ licensees were inspected a total of 4,047 times, and the 7 LGBTQ+ licensees were inspected a total of 63 times.  *Id.* ¶¶ 5–6.  Accordingly, the non-

---

[6]Plaintiffs and Defendants appear to disagree about whether an investigator has statutory carte-blanche to enter a licensed premises for inspection "at any time" or whether he or she may do so "only when there are reasonable grounds to believe that a violation . . . has occurred." *See* DCSF ¶ 6; PRCSF ¶ 6.  Because the answer to that question does not bear on the outcome of this MSJ, it is not addressed further.
[7]Scarlet self-describes as a "vibrant LGBTQ+ nightclub and bar business in the heart of Chinatown in Honolulu, Hawai'i."  Declaration of Robert Baldwin ("Baldwin Decl.") ¶ 2, Dkt. No. 118.

LGTBQ+ rate of inspection was 2.7 inspections per licensee,[8] and the LGBTQ+ rate of inspection was 9 inspections per licensee.[9]  Therefore, in 2020, licensees that identified as LGBTQ+ were inspected 333% more often[10] than those that did not.[11]

Similarly, in 2021, 5,942 inspections were performed across the 1,500 licensees.  *Id.* ¶ 4.  The 1,493 non-LGBTQ+ licensees were inspected a total of 5,893 times, and the 7 LGBTQ+ licensees were inspected a total of 49 times.[12]  *Id.* ¶¶ 5–6.  Accordingly, the non-LGBTQ+ rate of inspection was 3.9 inspections per licensee,[13] and the LGBTQ+ rate of inspection was 7 inspections per licensee[14]— meaning LGBTQ+ licensees were inspected 179%[15] more often than non-LGBTQ+ licensees.  Significantly, 4 out of the 7 LGBTQ+ licensees were closed down (not subject to inspection) for six out of twelve months in 2021.  *Id.* ¶ 12.  Thus, based on the facts in the record, it is fair to infer that the 179% comparison is an underestimate.[16]

---

[8]4,047 / 1,493 = 2.7.

[9]63 / 7 = 9.

[10]9 / 2.7 = 3.33 or 333%.

[11]In 2020, 1,008 out of 1,500 licensees were inspected at least once, with 492 licensees never being inspected.  PACSF ¶ 4.  All seven LGBTQ+ licensees were inspected at least once.  *Id.* ¶ 5.

[12]In 2021, all 1,500 licensees were inspected at least once.  PACSF ¶ 9.

[13]5,893 / 1,493 = 3.9.

[14]49 / 7 = 7.

[15]7 / 3.9 = 1.79 or 179%.

[16]Given that four of the seven LGBTQ+ establishments were shut down for 50% of the year, the 49 LGBTQ+ inspections were effectively spread across only five licensees.  (3 licensees were open 100% of the year, and 4 licensees were open 50% of the year.  3 x 100% + 4 x 50% = 5.)

Additionally, there is evidence in the record that Scarlet has been inspected by the HLC more often than other licensees.  For instance, Scarlet's owner attests that HLC investigators routinely visit the establishment several times per week, warning and threatening that the business will be shut down if any liquor or City violations are discovered.  *See generally* Declaration of Robert Baldwin ("Baldwin Decl."), Dkt. No. 118; *see also* PACSF ¶¶ 13–28, 43 (pointing to uncontroverted documentary evidence supporting Baldwin's claims of HLC's  focus on patrolling Chinatown, the district in which Scarlet is located); Declaration of Jhumar Ray Waite ("Waite Decl.") ¶¶ 6, 16, Dkt. No. 121 (claiming HLC personnel have made derogatory comments about the LGBTQ+ community, including Scarlet); Dkt. No. 118-1 (Fontaine follows all four of Scarlet's social media platforms online, even though she follows very few other licensees, reflecting a preoccupation with Scarlet); Dkt. No. 128 (Plaintiffs' oral argument stating the same).  As a more specific example, in July 2020, during the pandemic, Scarlet was open for only eight days but was inspected by HLC investigators six times.  Baldwin Decl. ¶ 20. Due to the HLC's "near constant pressure, Scarlet was forced to temporarily close[] its business on July 12, 2020 . . . ."  *Id.* ¶ 29; Dkt. No. 118-2 (social media post explaining the closure).  "As a result of the closure, Scarlet suffered the loss of

---

Therefore, the actual LGBTQ+ inspection rate was 9.8 inspections per licensee.  Assuming no non-LGBTQ+ licensees were similarly shut down during 2021—information not provided in the record by either party—LGBTQ+ licensees were actually inspected 251% more often than non-LGBTQ+ licensees in 2021.  (9.8 / 3.9 = 2.51 or 251%.).

several million dollars in potential revenue."  Baldwin Decl. ¶ 29; Dkt. No. 128

(oral argument, similar).

## II.   July 16, 2021 Scarlet Incident and July 19, 2021 GIG Internet Article

On the night of July 16, 2021, two HLC investigators observed an

unconscious man lying on Fort Street Mall near Scarlet.  DCSF ¶ 1; PRCSF ¶ 1.

After the investigators were unable to revive the person, they called 911 and an

HLC supervisor.  DCSF ¶¶ 2–3; PRCSF ¶¶ 2–3.  Three additional HLC

investigators then arrived at the scene, including Fears.  DCSF ¶ 4; PRCSF ¶ 4.

Out of "general curiosity" about the intoxicated man, Fears and another

investigator decided to inspect Scarlet.  DCSF ¶ 5; PRCSF ¶ 5; Deposition of

William Walker ("Walker Dep.") at 43, 62–63, Dkt. No. 117-5 at 8–10.  Initially,

Fears attempted to enter Scarlet through an unauthorized door and without

identifying himself as an HLC investigator.  DCSF ¶¶ 7–9; PRCSF ¶¶ 7–9.  He

was therefore denied entry by Scarlet personnel.  DCSF ¶¶ 7–9; PRCSF ¶¶ 7–9.

Nearby police officers intervened, and, after Fears disclosed his identity, Scarlet's

management allowed him onto the premises for the inspection.  DCSF ¶ 8; PRCSF

¶ 8.

On July 19, 2021, GIG published an account of the July 16, 2021 incident

online.  DCSF ¶ 12; PRCSF ¶ 12; Dkt. No. 102-12.  The account did not reflect

favorably on the HLC and specifically asserted that Fears had assaulted Scarlet personnel.  DCSF ¶ 12; PRCSF ¶ 12; Dkt. No. 102-12.

## III.   Scarlet's August 11, 2021 Complaint to the HLC

On August 11, 2021, Scarlet filed a formal complaint with the HLC, alleging biased treatment of itself and other LGBTQ+ establishments by Fears and the HLC more generally.  PACSF ¶ 43; Baldwin Decl. ¶¶ 24–25.  Within the next three days, Scarlet was inspected twice—by four investigators on August 13, 2021 and by two investigators on August 14, 2021—which Scarlet attributes to retaliation for the filing of the formal complaint, rather than legitimate regulatory reasons. PACSF ¶ 43.

After receiving Scarlet's formal complaint, then-HLC Administrator Franklin Pacarro, Jr. directed internal investigator Vivian Hee to investigate the complaint.  *See* Deposition of Anna Hirai ("Hirai Dep.") at 65, Dkt. No. 117-4 at 4. Hee did not conduct a thorough investigation into the complaint's allegations—for instance, she failed to interview Scarlet's owners, security guards, or employees. *See* PACSF ¶ 44; Baldwin Decl. ¶ 25.  She then wrote a report finding that the allegations against the HLC were unfounded.  Hirai Dep. at 65; PACSF ¶ 44.

Plaintiffs claim that current HLC Assistant Administrator, Anna Hirai, "upheld [Hee's] finding[s]."  PACSF ¶ 44.  Hirai admits she never read Hee's report, but Plaintiffs have not pointed to any other evidence demonstrating Hirai's

10

role in Hee's investigation or in officially approving the results of that investigation.  *See generally* PACSF; Hirai Dep. at 65–66; Dkt. No. 128 (oral argument)

## IV.    October 23, 2021 Incident at White Sands Hotel involving GIG

On October 15, 2021, the HLC received a citizen complaint alleging excessive noise at the White Sands Hotel ("White Sands") in Waikiki.  DCSF ¶¶ 13–14; PRCSF ¶¶ 13–14.

Eight days later, on October 23, 2021, GIG was hosting an event at the outdoor pool area of White Sands—GIG's first public event since publishing the July 19, 2021 Internet article that reflected unfavorably on the HLC.  DCSF ¶ 16; PRCSF ¶ 16.  Fears and Fontaine appeared at the event, claiming the need to follow-up on the eight-day-old noise complaint.  *See* DCSF ¶ 15; PRCSF ¶ 15; Declaration of Walter Enriquez ("Enriquez Decl.") ¶ 5, Dkt. No. 120; Dkt. No. 128 (oral argument).

While at the event, Fears and Fontaine purportedly witnessed violations of COVID-19-related social distancing restrictions—violations Plaintiffs dispute occurred—and issued notices of such violations to White Sands.  DCSF ¶¶ 17–20; PRCSF ¶¶ 17–20; Dkt. No. 102-6 (Office of the Mayor, City and County of Honolulu, Proclamation and Emergency Order No. 2021-14).  They also issued a 24-hour shutdown order to White Sands, which had the effect of ending the GIG

event at approximately 4:00 p.m., about an hour before it was scheduled to do so. DCSF ¶¶ 16, 22; PRCSF ¶¶ 16, 22; Enriquez Decl. ¶ 7.  White Sands later pled no contest to the social distancing restriction violations.  DCSF ¶¶ 18, 20; PRCSF ¶¶ 18, 20.

As a result of the White Sands incident, "several venues have refused or been reluctant to host events for [GIG], leading to the loss of thousands of dollars in revenue" for GIG.  Enriquez Decl. ¶ 9.  "Additionally, attendees have been hesitant to attend [GIG] events due to the belief that the [events] are being targeted and will be closed."  *Id.*; Dkt. No. 128 (oral argument, similar).

## V.   Waite Complaint and Participation in an HLC Audit

Jhumar Ray Waite is a gay man currently employed as an HLC investigator. PACSF ¶ 35; Waite Decl. ¶ 2.  Hired on August 16, 2022, he is the only male in his office who identifies as gay.  Waite Decl. ¶¶ 3–4.  During his tenure at HLC thus far, Waite has been subjected to harassment and discrimination based on his sexual orientation.  *Id.* ¶¶ 5–25 (describing numerous incidents of discriminatory actions by supervisors and fellow investigators).  For example:

- Implicitly referring to Waite's sexual orientation, Hirai stated publicly at Waite's swearing-in ceremony that the HLC was "trying something new here with this new investigator," and that it was "an experiment, the first of its kind."  *Id.* ¶¶ 21–22 (Waite believes he was hired by the HLC as a "token" gay man).

- Fears once directed Waite to enter a gay bar for inspection solely because Waite was gay and "could act as a translator for gay members of the establishment." *Id.* ¶¶ 7, 21.

- Waite believes the HLC never intended to retain him as an employee beyond his probationary period. *See id.* ¶ 23 (Fontaine told Waite in November 2022, with regard to a 2023 workshop, "You guys won't be here by then," and then refused to comment further).

On January 12, 2023, Waite filed a complaint with the HLC's Administrative Service Coordinator, Akiko Reyes, alleging discrimination and harassment by the HLC and, specifically, Fears and Fontaine. *Id.* ¶ 17.  After filing his complaint, Waite was placed on administrative leave, even though under his collective bargaining agreement, when a person files such a complaint, the *accused* is supposed to be placed on administrative leave for the duration of the complaint's investigation, *not* the person filing the complaint. *Id.* ¶ 18.

Meanwhile, on October 5, 2022, the Honolulu City Council adopted Resolution 22-207, CD1 Urging the City Administration and the Liquor Commission to Take Action to Restore Public Trust in the Liquor Commission. PACSF ¶ 41; Dkt. No. 117-16 (City Council Resolution finding, "[F]or the last two decades, the [HLC] has been plagued with negative public media reports, news articles, and complaints regarding alleged corruption and unethical behavior within the [HLC]," and citing this lawsuit as one reason for the Resolution).

In response to Resolution 22-207, on February 9, 2023, Honolulu Mayor Rick Blangiardi appointed an ethics and compliance expert to conduct a system-

wide audit of the HLC's enforcement division.  PACSF ¶ 42.  As part of this audit, the HLC conducted a "System Review," in which Waite participated by engaging in a "System Review Interview."  *Id.* ¶ 39; Waite Decl. ¶ 24.  Before that interview, Reyes instructed Waite not to mention his experience with discrimination during the interview because his claims were part of an "ongoing internal investigation."  Waite Decl. ¶ 24.  Reyes also falsely informed Waite that he "was bound by a confidentiality agreement."  *Id.*  After the interview, Waite received a text asking about his "performance" in the interview from an HLC supervisor who had no legitimate reason to be involved in, or even know about, Waite's interview.  *Id.*  Waite showed Reyes the text, and the supervisor then falsely claimed the message had been sent in error and was meant for someone else.  *Id.*

## VI.  HLC Training

Upon being hired, HLC investigators receive a two-week in-office training program, during which they are instructed to independently read Hawaiʻi's liquor laws and HLC rules, review old investigative reports, and review an out-of-date binder of policies and procedures.  PACSF ¶ 30; Deposition of Don Pacarro ("Pacarro Dep.") at 22, Dkt. No. 117-10 at 2.  There is little to no oversight by senior investigators during this in-office training period, and the new investigators do not undergo any check or exam to ensure they understand the HLC's rules,

policies, or procedures. PACSF ¶ 30. The new investigators then shadow senior investigators for six months of probationary on-the-job learning. *Id.* At least two HLC investigators have opined that HLC training and supervision is less than adequate. *Id.* ¶ 31; Walker Dep. at 15–18, 87, Dkt. No. 117-5 at 3–6, 11 (describing a disorganized training program and stating his opinion that there is not "proper training of probationary liquor control investigators"); Deposition of Catherine Fontaine ("Fontaine Dep.") at 84–85, Dkt. No. 117-2 at 5–6 (responding that she "felt like it could have been better" when asked whether "there was adequate training" at HLC.

## DISCUSSION

### I.     Official Capacity Claims Against Fears and Fontaine

"An official capacity suit against a municipal officer is equivalent to a suit against the entity." *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sherriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)). "When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Id.* (citing *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)). Here, both Fears and Fontaine are redundant Defendants because they are named only in their official capacities, along with HLC. Fears and Fontaine are therefore dismissed from this action with prejudice.

Count 5, which requests injunctive relief as against Fears and Fontaine, is also DISMISSED WITH PREJUDICE.  *See* FAC ¶¶ 125–128.

## II.      Constitutional Claims Against HLC

Counts 1 and 2 of the FAC assert claims of constitutional violations against the HLC pursuant to 42 U.S.C. § 1983.  In Count 1, Scarlet and GIG claim that the HLC deprived them of equal protection under the law by disproportionately enforcing HLC's policies against them on the basis of their owners' and clientele's sexual orientations.  In Count 2, GIG claims it was deprived of procedural due process when the HLC shut down GIG's October 23, 2021 gay pride event without a legitimate purpose or proper process.

To impose Section 1983 liability on a local government entity or municipality like the HLC for deprivation of constitutional rights, a plaintiff must establish:

> (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation."

*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)).  Therefore, the threshold question is whether the plaintiff was deprived of a constitutional right.  As explained in the next two sections, here, there is a genuine issue of material fact as to whether the

Plaintiffs were deprived of their rights to equal protection and procedural due process under Counts 1 and 2.

<u>Count 1: Equal Protection Claim</u>

The Equal Protection Clause states, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. IV, § 1.  Under this clause, businesses have the right to be free from discriminatory or selective enforcement of otherwise valid business regulations.  *Yick Wo v. Hopkins*, 118 U.S. 356, 367 (1886) (striking down a municipal practice of denying operating permits to Chinese laundry owners due to their race).

An equal protection claim consists of two elements: (1) disparate impact, and (2) discriminatory intent.  *Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1152–53 (9th Cir. 2007).  To prove disparate impact, "the claimant must show that similarly situated individuals" were not subject to the same effect.  *Id.* at 1153 (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).  To prove discriminatory intent, a plaintiff must show that "a discriminatory purpose has been a motivating factor" for the disparate impact—a determination that "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *Rosenbaum*, 484 F.3d at 1153 (holding a particular course of action was taken "at least in part because of, not merely in spite of, its adverse

effects upon an identifiable group") (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)) (internal quotation marks omitted); *Washington v. Davis*, 426 U.S. 229, 242 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [official conduct] bears more heavily on one [category of people] than another.").[17]

Here, taking all evidence and inferences in the light most favorable to Plaintiffs, there is a genuine issue of material fact as to whether both Plaintiffs suffered equal protection violations. First, with regard to disparate impact, it is fair to infer that both Scarlet and GIG have been subjected to a higher level of scrutiny and a higher inspection rate than other "similarly situated" persons. *See Rosenbaum*, 484 F.3d at 1153; PACSF ¶¶ 4–12 (showing LGBTQ+ licensees are inspected at a significantly higher rate than non-LGBTQ+ licensees)[18]; Baldwin

---

[17]If a Plaintiff proves disparate impact and discriminatory intent, a municipality's action may yet be constitutional if the municipality then shows "that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 532–33 (1996) (defining intermediate scrutiny test in gender discrimination context) (internal quotation marks and citation omitted); *SmithKline Beecham Corp. v. Abbott Lab'ys*, 740 F.3d 471, 480–81 (9th Cir. 2014) (applying intermediate scrutiny test in sexual orientation discrimination context). Here, the Court does not conduct an intermediate scrutiny analysis because Defendants only contend that the discriminatory classification does not exist; they do not contend that, if such a classification *did* exist, it was substantially related to an important governmental objective.
[18]Defendants contend that the statistical data on which this fact is based is "not credible, [and] not something that the court can rely on because it's not done by a qualified expert who can compare like licensees." *See* Dkt. No. 128 (oral argument draft transcript at 8:12–9:9); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). The Court is not persuaded. First,

Decl. ¶¶ 13–29 (attesting that HLC investigators harass and threaten Scarlet employees with closure several times a week and that Scarlet was inspected six separate times over a period of eight days in July 2020, even though a similarly situated non-LGBTQ+ business was inspected only once during a period of two months in the same time frame); PACSF ¶¶ 13–28 (HLC's internal documentation demonstrating an unexplained and atypical focus of investigators around Scarlet's location); Dkt. No. 125 (failing to provide a legitimate reason for the disproportionate inspection rate of LGBTQ+ licensees or the unusually high volume of inspectors around Scarlet's location); Baldwin Decl. ¶ 27 and Dkt. No. 118-1 (showing Fontaine follows Scarlet and GIG, but few other licensees, on social media); PRCSF ¶¶ 13–19, 22 and Enriquez Decl. ¶¶ 5, 7 (tending to prove that HLC investigators inspected and closed down GIG's October 23, 2021 gay pride event for retaliatory purposes).

Second, with regard to discriminatory intent, it is fair to infer that such disparate enforcement was motivated, "at least in part," by a discriminatory

---

Defendants have not shown, and it is not clear, that the statistical evidence would not be admissible at trial. Plaintiffs have presented detailed, uncontroverted evidence showing a disparity in inspection rates—a discrepancy that can be deduced using rudimentary mathematical calculations. Defendants cite to no rule of evidence showing this data would be necessarily excluded. Moreover, Defendants could have presented their own facts to explain away the apparent disparity, but they did not do so. In fact, Defendants did not refute the facts in Plaintiffs' additional concise statement at all, deeming those facts admitted. *See* LR 56.1(e), (g). Finally, if it is a question of the weight attributable to the data and its analysis, it is not the Court's role at this stage to weigh evidence, but to determine whether the evidence presents a genuine dispute of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Here, it does.

purpose. *See Arlington Heights*, 429 U.S. at 265–66. First, the Court may consider the fact of the disparate impact *itself* when conducting its "sensitive inquiry" into the facts available in order to assess the HLC's motivations. *See id.*; *Davis*, 426 U.S. at 242 ("Necessarily, an invidious discriminatory purpose may often be inferred from *the totality of the relevant facts, including the fact . . . that the [official conduct] bears more heavily on one [category of people] than another*.") (emphasis added). For instance, it is highly relevant to this inquiry that, in 2020 and 2021, LGBTQ+ licensees were subject to a significantly higher rate of inspection than non-LGBTQ+ licensees, and that Defendants have not explained this discrepancy. *See* PACSF ¶¶ 4–12; Dkt. No. 125. Moreover, the record is replete with other evidence tending to prove that HLC employees harbor anti-LGBTQ+ animus. *See, e.g.*, Waite Decl. ¶¶ 6, 16 (claiming certain HLC personnel have a specific vendetta against Scarlet, GIG, and other LGBTQ+ establishments); *generally* Waite Decl. (describing rampant anti-gay discrimination and harassment by HLC leadership, including that HLC leadership views the hiring of a gay person as an "experiment"); PACSF ¶¶ 25, 32–34 (evidence that some HLC employees and leaders are openly homophobic and transphobic). Based on the direct and circumstantial evidence available in the record, there is a genuine dispute of material fact as to whether the disparate impact of the HLC's policies was

motivated by a discriminatory purpose.  Therefore, genuine disputes of material fact exist regarding Count 1's equal protection claims.

Count 2: Due Process Claim

The Due Process Clause states, "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. IV, § 1.  To show a violation of procedural due process,[19] a plaintiff must establish the existence of "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process."  *Guatay Christian Fellowship v. Cnty. of S.D.*, 670 F.3d 957, 983 (9th Cir. 2011).

Here, GIG claims it:

> was deprived of certain constitutionally protected property interests without sufficient process when Investigator Fears and Investigator Fontaine, and the Liquor Commission . . . unlawfully entered [GIG]'s event at [] White Sands [] on October 23, 2021 and on the false pretense that there was a noise ordinance violation[], shut down the LGBTQ+ event without cause. . . .  [GIG] has a protected property interest in the gay pride event . . . .  Shutting down the event hours prior to the scheduled close of the event without warning, notice or any ability for [GIG] to be heard on the premature termination of the event caused [GIG] injury.

Complaint ¶¶ 100–01; Enriquez Decl. ¶ 7.  GIG claims that the illegitimate shut-down of its event (i) deprived it of revenue for the final scheduled hour of its event,

---

[19]There are two types of Fourteenth Amendment due process claims: substantive and procedural. Although not explicit, from the language in the Complaint and relevant briefing, it does not appear that GIG is asserting a substantive due process violation.  *See* Complaint ¶¶ 100–01.

(ii) caused collateral damage by discouraging venues from working with it after-the-fact and by discouraging potential attendees from joining future events, resulting in lost revenue and reputational damage, and (iii) caused other damages stemming from degradation inherent in the rights violation. *See* Complaint ¶¶ 105–107; Enriquez Decl. ¶ 9.

For their part, Defendants have not challenged any of the three elements of a procedural due process violation. Instead, their only argument with regard to Count 2, for purposes of this MSJ, is that GIG did not suffer any injury. *See* Dkt. No. 101 at 18–19 ("Plaintiffs' Section 1983 Due Process Claim Fails Where There Is No Evidence of Any Injury to GIG."); Dkt. No. 125 at 7 ("Plaintiffs' . . . due process claim [] fails for lack of an actual injury."); Dkt. No. 128 (oral argument, same). And the premise of this argument is Defendants' claim that it is undisputed that the GIG event was not shut down before its scheduled end-time of 5:00 p.m. *See* Dkt. No. 101 at 18–19; Dkt. No. 128 (oral argument).

This argument fails for at least two reasons. First, the premise is untrue. Though video evidence shows Fears and Fontaine telling White Sands personnel that they did not "want to break [the event up] early," *see* Dkt. No. 102-11 (video at minute 5:00), GIG has attested that the event was nonetheless terminated around 4:00 p.m., an hour prematurely. Enriquez Decl. ¶ 7. Therefore, there *is* a dispute as to whether the investigators' actions resulted in an early shut-down or other

22

injurious disruption to the event. *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (court should not weigh evidence on summary judgment). Second, even if there *was* no dispute as to lost revenue from an early shut-down of an event in October 2021, GIG has alleged additional injuries that Defendants have not addressed. *See* Complaint ¶¶ 105–07; Enriquez Decl. ¶ 9 (claiming additional lost revenue from reputational harm and other damages). Thus, assuming injury is required for GIG's due process claim to proceed, Defendants have not demonstrated the absence of a genuine issue of material fact in that regard.[20]

***

---

[20]Furthermore, it is not at all clear that injury *is* a required element of a due process claim. Defendants provide no supportive caselaw for that proposition, *see* Dkt. Nos. 101 at 18–19; 125 at 7, and, injury (or damages) is not one of the three elements of a procedural due process violation. *See Guatay*, 670 F.3d at 983. As the Supreme Court has explained, even if a party suffers no actual damages, it may still be entitled to nominal damages if a procedural due process violation is established:

> Even if [a party that has been deprived of procedural due process] . . . d[oes] not suffer any [] actual injury, the fact remains that they were deprived of their right to procedural due process. . . . Common-law courts traditionally have vindicated deprivations of certain 'absolute' rights that are not shown to have caused actual injury through the award of a nominal sum of money. By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed . . . . Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, . . . we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.

*Carey v. Piphus*, 435 U.S. 247, 266–67 (1978). Thus, even if GIG suffered no injury, summary judgment would not be warranted on this basis.

Having determined, for purposes of the threshold question, that Defendants have not demonstrated the absence of a genuine issue of fact regarding whether Plaintiffs were deprived of their constitutional rights under Counts 1 and 2, the Court's next step is to determine if the HLC may be held liable for the potential deprivations. *See Oviatt*, 954 F.2d at 1474 (providing the four elements of a Section 1983 claim against a municipality). Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), there are three pathways to such liability: (1) Policy or Custom; (2) Failure to Train; and/or (3) Ratification. The Ninth Circuit has explained:

> A local government is liable for an injury under [Section] 1983 under *three possible theories*. *First*, a local government may be liable if execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicted the injury. *Second*, a local government can fail to train employees in a manner that amounts to deliberate indifference to a constitutional right, such that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. *Third*, a local government may be held liable if the individual who committed the constitutional tort was an official with final policymaking authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 802–03 (9th Cir. 2018) (emphasis added) (internal quotation marks and citations omitted). Here, as discussed below, there is a genuine dispute of material fact regarding the first and second pathways to liability, but not the third.

24

A.     Custom or Practice

A municipality may be liable under *Monell* if a longstanding, informal[21] practice or custom within the entity was the "moving force" behind the constitutional violation.  436 U.S. at 691; *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973–74 (9th Cir. 2021) ("[A] public entity may be held liable for a "longstanding practice or custom.").  A plaintiff may prove "the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992); *see also Oviatt*, 954 F.2d at 1473–74 ("[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.").

Here, there is a genuine dispute of material fact as to whether the HLC maintains an informal custom or practice of disproportionately targeting LGBTQ+ businesses for regulatory enforcement.  There is evidence of a sweeping disparity between LGBTQ+ and non-LGBTQ+ inspection rates in the years 2020 and 2021, which may reflect "repeated constitutional violations." *See Gillette*, 979 F.2d at 1349; PACSF ¶¶ 4–12.  There is also evidence of constitutional violations against both Scarlet and GIG in the years 2020 and 2021. *See supra* at 17–23 (discussion

---

[21]Plaintiffs concede that there was no formal or official policy of unconstitutional discrimination against LGBTQ+ licensees at the HLC.  Dkt. No. 116 at 13.

of equal protection and due process claims).  Finally, taking the record and

inferences in the light most favorable to Plaintiffs, there is evidence of discrete

constitutional violations by individual officials who "were not discharged or

reprimanded" by the HLC.  For example:

- After Scarlet filed an internal complaint alleging anti-gay bias, (i) the HLC
  inspected Scarlet twice in the next three days in retaliation, (ii) internal
  investigator Hee performed a perfunctory investigation concluding that the
  complaint was unfounded without speaking to relevant witnesses, and (iii)
  HLC's Acting Administrator signed off on Hee's report without bothering to
  read it.  PACSF ¶¶ 43–44; Baldwin Decl. ¶ 25; Hirai Dep. at 65.

- After Waite filed an internal complaint alleging sexual orientation
  harassment and discrimination, Waite, the victim, was placed on
  administrative leave, while the alleged perpetrators were not.  Waite Decl.
  ¶¶ 17–18.  Additionally, Reyes—the Administrative Services Coordinator to
  whom Waite entrusted his complaint—and another HLC supervisor worked
  against organizational accountability by convincing Waite not to share the
  details of his experience with an external party during a Mayor-directed
  audit interview.  *Id.* ¶ 24.

*See also* PACSF ¶¶ 41–42 (City Council Resolution finding that the HLC is

routinely plagued with complaints about corruption and unethical behavior).

All of these potential violations share the same core stimulus: anti-LGBTQ+

animus by HLC leadership and employees.  Therefore, taking the evidence in the

light most favorable to Plaintiffs for purposes of this MSJ, the Court infers that a

custom or practice of anti-LGBTQ+ discrimination exists within the HLC, that the

policy "amounts to deliberate indifference" to Plaintiffs' constitutional rights, and

that the policy was the "moving force" behind the constitutional violations asserted

in Counts 1 and 2.  *See Oviatt*, 954 F.2d at 1474 (quoting *Canton*, 489 U.S. at 389–

91).  As a result, summary judgment is not warranted on either Count.[22]

    B.    <u>Failure to Train</u>

    A municipality may also be liable under *Monell* if a plaintiff shows: "(1) an

inadequate training program, (2) deliberate indifference on the part of the

[municipality] in adequately training its law enforcement officers, and (3) [that] the

inadequate training actually caused a deprivation of [a plaintiff's] constitutional

rights."  *Merritt v. Cnty. of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989); *Canton*, 489

U.S. at 389, 392 (entity may be liable if it failed to train its employees in such a

way that "reflects a 'deliberate' or 'conscious' choice by [the] municipality").  The

municipality's deliberate indifference may be shown through a "pattern of tortious

conduct by inadequately trained employees" or where "a violation of federal rights

may be a highly predictable consequence of a failure to equip law enforcement

officers with specific tools to handle recurring situations."  *Bd. of Cnty. Comm'rs*

*v. Brown*, 520 U.S. 397, 407–09 (1997); *see also Canton*, 489 U.S. at 390 n.10

(entity may be liable if it "so often violate[s] constitutional rights that the need for

further training must have been plainly obvious to the city policymakers, who,

nevertheless, are 'deliberately indifferent' to the need").

---

[22]A single avenue to liability under *Monell* is sufficient to defeat Defendants' MSJ on Counts 1
and 2.

Here, there is a genuine dispute of material fact as to each of the three elements of a failure-to-train claim. *See Merritt*, 875 F.2d at 770.  First, there is evidence that HLC's training program is inadequate.  At least two investigators, one of whom is a Defendant in this case, have actually stated their opinions that the training program is not "proper" and "could [] be[] better."  Walker Dep. at 15–18, 87; Fontaine Dep. at 84–85.  Indeed, their descriptions reflect a disorganized program that contains little to no oversight by senior personnel and no verification of employees' proficiency, skill, or capacity before sending them into the field to exercise their power.  *See* PACSF ¶¶ 30–31; Walker Dep. at 15–18, 87; Fontaine Dep. at 84–85; Pacarro Dep. at 22.  More pointedly, it does not appear that the training program contains any component focused on sensitivity to diverse licensees, such as LGBTQ+ businesses.

Second, it is reasonable to infer that the HLC has been deliberately indifferent to the need for better training among its ranks.  New and senior investigators alike possess substantial amounts of power: they are the gatekeepers for liquor licenses, and they have the ability to threaten business closure among licensees.  Even without more, it is "plainly obvious" that it would be reckless to send such individuals into the community to accomplish their regulatory tasks without ensuring they understand their roles and the limits of their power, and without verifying they possess the capacity to communicate and interact

respectfully with diverse populations of people.  *See Canton*, 489 U.S. at 390 n.10.

Constitutional violations would be a "highly predictable consequence of a failure

to equip law enforcement officers with specific tools to handle [such] recurring

situations."  *See Brown*, 520 U.S. at 407–09.

Moreover, there is evidence that HLC leaders are aware of a more specific

"pattern of tortious conduct" and have nonetheless failed to respond to the need for

better training.  *See id.*  For instance:

- The City Council Resolution found, "[F]or the last two decades, the [HLC] has been plagued with negative public media reports, news articles, and complaints regarding alleged corruption and unethical behavior within the [HLC]."  Dkt. No. 117-16.

- In 2015, after an incident involving an HLC Investigator Homer Tampua, Scarlet complained to the HLC's Internal Affairs Investigator that Tampua had displayed overt homophobia, aggression, and unprofessionalism in conducting an inspection of Scarlet, ultimately closing Scarlet down temporarily.  Baldwin Decl. ¶¶ 6–8.  The Internal Affairs Investigator told Scarlet that the HLC was aware of Tampua's history of discrimination and that Tampua would be dismissed, but, as of June 2023, Tampua was still an active employee of the HLC.  *Id.*[23]

- A similar event occurred in 2017 involving an HLC Investigator Scott Perez. Scarlet notified the HLC that Perez was repeatedly harassing a transgender employee, after which Perez was not disciplined.  *Id.* ¶¶ 9–12.

- Scarlet filed an August 2021 formal complaint against Fears and Fontaine and the HLC more generally, alleging sexual orientation discrimination, and no action was taken to discharge or reprimand the offenders.  PACSF ¶¶ 43– 44; Hirai Dep. at 65.

---

[23]Events that occurred prior to the statutory limitations period may be utilized for contextual purposes and to establish longstanding custom or deliberate indifference under *Monell*, even though those events may not themselves be the basis for an independent cause of action.

- Waite filed a January 2023 formal complaint, accusing numerous HLC leaders and employees of sexual orientation harassment and discrimination, and no action was taken to discharge or reprimand the offenders, but Waite himself was placed on administrative leave.  Waite Decl. ¶¶ 17–18.

Assuming these disputed facts are resolved in Plaintiffs' favor, "the need for further training" to address these recurring deficiencies is obviously warranted, but has not been implemented.  *See Canton*, 489 U.S. at 390 n.10.  In fact, there is evidence that HLC leaders were *not only* deliberately indifferent to the need for better training, but affirmatively perpetuated a culture of discriminatory behavior. *See* Waite Decl. ¶¶ 21–24 (tending to prove that HLC leaders including Hirai, Reyes, Fontaine, Fears, and other HLC supervisors have overtly harassed LGBTQ+ individuals and have worked together to prevent appropriate remedial action from being taken).

In sum, given HLC's failure to provide training to its investigators on anti-discrimination and LGBTQ+ sensitivity, and the nature of the constitutional violations alleged, insofar as those violations are rooted in anti-LGBTQ+ bias, there is a genuine dispute of material fact as to whether HLC's failure to train caused the alleged deprivation of Plaintiffs' constitutional rights.  As a result, this second pathway to *Monell* liability remains viable and provides another basis on which to deny summary judgment on Counts 1 and 2.

C.    Ratification

Finally, a municipality may be liable under *Monell* if a final policymaker

knowingly and affirmatively ratifies a subordinate's unconstitutional action.  *City*

*of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (emphasizing that ratification

must be accomplished by an official with "final policymaking authority") (citing

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–83 (1986) (plurality opinion));

*Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (ratification requires proof of

a policymaker's knowledge of the underlying constitutional violation); *Haugen v.*

*Brosseau*, 339 F.3d 859, 875 (9th Cir. 2003), *reversed on other grounds by*

*Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam)) ("A single decision by a

municipal policymaker 'may be sufficient to trigger section 1983 liability under

*Monell*, . . . but the plaintiff must show that the triggering decision was the product

of a conscious, affirmative choice to ratify the conduct in question.") (quotation

marks and citation omitted); *Gillette*, 679 F.2d at 1348 (mere failure "to overrule

the unconstitutional discretionary acts of subordinates[,]" without express

approval, is insufficient).  "[W]hether a particular official has 'final policymaking

authority' is a question of state law."  *Praprotnik*, 485 U.S. at 124 (citing *Pembaur*,

475 U.S. at 480–83 (plurality opinion)); *Ellins v. City of Sierra Madre*, 710 F.3d

1049, 1066 (9th Cir. 2013).  "[T]he challenged action must have been taken

pursuant to a policy adopted by the official or officials responsible under state law

for making policy in *that area* of the city's business." *Praprotnik*, 485 U.S. at 124 (citing *Pembaur*, 475 U.S. at 480–83 (plurality opinion)).

Here, Plaintiffs assert that one event constituted ratification: Hirai's approval and adoption of Hee's report dismissing Scarlet's August 2021 complaint. *See* Dkt. No. 116 at 18–20. However, Plaintiffs have not shown any of the required ratification elements. First, it is not clear that Hirai was a "final policymaker" for purposes of *Monell. See Praprotnik*, 485 U.S. at 124 (citing *Pembaur*, 475 U.S. at 480–83) (plurality opinion)). Although Plaintiffs claimed at oral argument that Hirai was the Acting Administrator of the HLC when Hee's report was completed, *see* Dkt. No. 128, they pointed to nothing in the record to confirm this fact. Nor have they presented state law authority showing that the HLC's Acting Administrator is one of the officials responsible for making policy in this arena. *See Praprotnik*, 485 U.S. at 124 (citing *Pembaur*, 475 U.S. at 480–83) (plurality opinion)).

Furthermore, the Court can find nothing in the record showing that Hirai, in fact, approved Hee's report at all. *See* PACSF ¶ 44 (stating without evidence that Hirai "upheld [Hee's] findings" on October 22, 2021); *Haugen*, 339 F.3d at 875 (ratification requires a "conscious, affirmative choice"); *Gillette*, 679 F.2d at 1348 (failure to overrule unconstitutional discretionary acts of subordinates, without express endorsement, is insufficient). And, even if Hirai did affirmatively uphold

Hee's findings, Plaintiffs have not pointed to evidence showing that she did so *knowing* that the report wrongly dismissed valid complaints of constitutional dimension.  *See* PACSF ¶ 44 (Hirai did not even read Hee's report); *Christie*, 176 F.3d at 1239 (ratification requires proof of a policymaker's knowledge of the underlying constitutional violation).  In sum, there is no genuine dispute of material fact regarding Plaintiffs' ratification claim, and the third *Monell* pathway does not present a means for liability on Counts 1 or 2.

## III.      Statutory Claim against HLC

In Count 3, Plaintiffs claim that the HLC violated H.R.S. § 489-3.  That statute states:

> Unfair discriminatory practices that deny, or attempt to deny, a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation on the basis of race; sex, including gender identity or expression; sexual orientation; color; religion; ancestry; or disability, including the use of a service animal, are prohibited.

H.R.S. § 489-3.  Chapter 489 was enacted "to protect the interests, rights, and privileges of all persons within the State with regard to access and use of public accommodations by prohibiting unfair discrimination."  H.R.S. § 489-1.  A place of public accommodation is defined as a "business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public."  H.R.S. § 489-2.

Defendants contend that liability cannot attach to the HLC under H.R.S. § 489-3 because—as Plaintiffs admit—the HLC is not itself a place of public accommodation.[24]  Dkt. No. 101 at 19–20; Dkt. No. 128 (Plaintiffs' oral argument, admitting that the HLC is not a place of public accommodation).

However, from the plain language of the statute[25], and absent any caselaw to the contrary, H.R.S. § 489-3 prohibits discriminatory practices that result in the denial of the full and equal enjoyment of a place of public accommodation.  The statute does not identify or limit the source of any such discriminatory practice, much less indicate that a government agency or entity cannot be that source, as hypothesized by Defendants.[26]  Therefore, there is no reason why HLC, gatekeeper

---

[24]In their MSJ, Defendants incorrectly describe the statute as prohibiting "discrimination by a public accommodation."  Dkt. No. 101 at 19.

[25]"When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is obtained primarily from the language contained in the statute itself."  *Iddings v. Mee-Lee*, 919 P.2d 263, 268 (Haw. 1996).  Thus, a court should "give words [in a statute] their common meaning."  *Id.* at 269; *see also United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013) ("[U]nless defined, words in a statute will be interpreted as taking their ordinary, contemporary, common meaning.") (quotation marks and citation omitted).

[26]As Defendants point out, in *State v. Hoshijo*, 76 P.3d 550, 561 (Haw. 2003), the Hawaiʻi Supreme Court stated that "liability [under H.R.S. § 489-3] attaches to a person that is an owner, operator, lessee, agent, or employee of a public accommodation."  *See* Dkt. No. 125 at 11.  However, *Hoshijo* did not hold that liability may attach *only* to those persons.  There, the person being accused of discriminatorily withholding its services *was* a place of public accommodation, a state university.  Thus, that case did not provide an opportunity for that court to decide whether anyone else could be subject to statutory liability.  No case of which this Court is aware has defined the contours of H.R.S. § 489-3 liability.  Further, the Court agrees with Plaintiffs that *Epileptic Found. v. City & Cnty. of Maui*, 300 F. Supp. 2d 1003, 1016–17 (D. Haw. 2003)—to which Plaintiffs pointed during oral argument—provides persuasive support for the proposition that Section 489-3 liability attaches in much broader ways than Defendants wish to acknowledge.  *Epileptic* held, for instance, that liability could attach to the Maui Department of Parks and Public Recreation for discriminatory practices that resulted in the denial of access to public parks.  *See id.*

of liquor licenses, cannot be held liable under H.R.S. § 489-3 if its discriminatory practices prevent the enjoyment of Scarlet's services.[27]  *See State v. Hoshijo*, 76 P.3d 550, 560 (Haw. 2003) (holding that "person" under H.R.S. § 489-3 includes "any governmental entity or agency").  Summary judgment is not warranted on Count 3.

## IV.      Negligence Claim against HLC

In Count 4, Plaintiffs claim that the HLC engaged in the tort of negligent hiring, training, supervision, and retention by:

> failing to properly train and supervise its employees and contractors in: (a) proper and reasonable inspection procedures and the limits of their authority, (b) the knowledge and understanding of the liquor laws of Hawaiʻi and the Rules of the Honolulu Liquor Commission, and (c) how to properly handle interactions and relations with the LGBTQ+ community, [while] under [a certain HLC] 2002 settlement agreement, all current and future employees would be required to undergo mandatory discrimination training on gender and sexual orientation and retaliation.

FAC ¶¶ 115–124.  Plaintiffs allege that the HLC had a "duty of care to properly and adequately hire, train, retain, [] supervise, and, where necessary, discipline its employees and contractors to avoid unreasonable risk of harm to persons affected by the actions of these employees and contractors." *Id.* ¶ 119.

Hawaiʻi recognizes the tort of negligent hiring and retention.  Under *Janssen v. Am. Haw. Cruises, Inc.*, 731 P.2d 163, 166 (Haw. 1987), the Hawaiʻi Supreme

---

[27]It is undisputed that Scarlet is a place of public accommodation.

Court explained there is "a duty on the part of [an] employer to exercise reasonable care in hiring individuals who, because of the nature of their employment, may pose a threat of injury to members of the public."  Hawaiʻi courts appear to recognize—and Defendants concede—that this duty extends to negligent retention. *See Murphy v. Lovin*, 284 P.3d 918, 928 (Haw. App. 2011) (affirming a jury instruction stating a defendant could breach the relevant duty by "hiring *or retaining* an employee") (emphasis added); *Murphy*, 284 P.3d at 929 n.15 ("A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in *selecting, training, retaining, supervising, or otherwise controlling the agent*.") (quoting Restatement (Third) of Agency § 7.05 (2006)) (emphasis added); Dkt. No. 101 at 20–21 (Defendants acknowledging that the tort encompasses negligent retention).

To prevail on this claim, a plaintiff must show: "(1) [the d]efendant owed a duty of care to the [p]laintiff; (2) [the d]efendant breached that duty by hiring or retaining an employee even though [the d]efendant knew, or should have known, of the employee's dangerous propensities; (3) the [p]laintiff suffered monetarily compensable physical or emotional injuries; and, (4) the breach of the duty was the proximate cause of [the p]laintiff's physical or emotional injuries." *Murphy*, 284 P.3d at 928.  In determining whether a defendant breached its duty of care in hiring

or retaining an employee, Hawaiʻi courts emphasize the foreseeability of harm.
*See id.*; *Janssen*, 731 P.2d at 166 ("The existence of a duty under a negligent hiring
theory depends upon foreseeability, that is, whether the risk of harm from the
dangerous employee to a person such as the plaintiff was reasonably foreseeable as
a result of the employment.") (quotation marks and citation omitted).

Defendants claim entitlement to summary judgment on this claim for two
reasons. First, Defendants assert that neither Plaintiff suffered any damages as a
result of the HLC's actions. This argument lacks merit because, as discussed in
prior sections of this Order, Defendants have failed to establish the absence of a
genuine dispute of material fact as to whether either Plaintiff has suffered damages.
*See supra* at 8–9 (regarding Scarlet's damages); *supra* at 23 (regarding GIG's
damages).

Second, Defendants claim that any harm was not foreseeable to the HLC
because "there is no evidence HLC hired any employee with knowledge of the
employee's 'dangerous propensities.'" Dkt. No. 101 at 21. Because Plaintiffs have
not offered anything to contradict this assertion, Plaintiffs negligent hiring claim
fails. *See Murphy*, 284 P.3d at 928. Defendants, however, leave unaddressed the
portion of Plaintiffs' fourth claim that asserts negligent *retention* of employees,
together with negligent training and supervision. Moreover, there is a genuine
dispute of material fact as to whether the HLC was made aware of any employees'

dangerous propensities after their employ and decided to retain them anyway.  *See, e.g.*, *supra* at 29–30 (describing the HLC's failure to discharge employees after receiving Scarlet's August 2021 complaint and Waite's January 2023 complaint); Baldwin Decl. ¶¶ 6–12 (claiming Investigators Tampua and Perez remain in the HLC's employ, even though the HLC is aware of their dangerous propensities); *see also supra* at 27–30 (harm should have been foreseeable on the basis of the HLC's deliberately indifferent failure to train). Summary judgment is thus not warranted on the claimed aspects of negligence beyond hiring.

## CONCLUSION

As discussed above, Defendants' MSJ, Dkt. No. 101, is GRANTED with regard to all claims against Fears and Fontaine in their official capacities. Summary judgment in favor of Defendants is also appropriate with regard to the "official policy" and ratification aspects of *Monell* liability and with regard to negligent hiring.  All other portions of Defendants' MSJ are DENIED.

IT IS SO ORDERED.

DATED: August 3, 2023 at Honolulu, Hawai'i.



Derrick K. Watson
Chief United States District Judge

*Scarlet Honolulu, Inc. et al vs. Honolulu Liquor Commission, et al*; Civil No. 21-00457 DKW-KJM; **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**