**KOBAYASHI SUGITA & GODA, LLP**
LEX R. SMITH                    3485
AARON R. MUN                    9779
ZACHARY K. SHIKADA              11750
First Hawaiian Center
999 Bishop Street, Suite 2600
Honolulu, Hawaii 96813
Phone (808) 535-5700
Fax: (808) 535-5799
Email: lrs@ksglaw.com; arm@ksglaw.com
       zks@ksglaw.com

Counsel for Defendant
HONOLULU LIQUOR COMMISSION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SCARLET HONOLULU, INC.; WALTER ENRIQUEZ d/b/a GAY ISLAND GUIDE, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> HONOLULU LIQUOR COMMISSION, <br><br> Defendant. | CIVIL NO. 21-00457 MWJS-KJM <br><br> DEFENDANT'S TRIAL BRIEF; EXHIBITS A–D; CERTIFICATE OF SERVICE <br><br><br><br> Trial: September 30, 2024 |

## <u>DEFENDANT'S TRIAL BRIEF</u>

### INTRODUCTION

This case is based on the false premise that the Plaintiffs are the victims of anti-LGBTQ+ bias on the part of the Honolulu Liquor Commission ("**HLC**").

This case arises out of two incidents. On July 16, 2021, there was a passed-out individual on Fort Street Mall near the entrance to Scarlet Honolulu ("**Scarlet**"). Two HLC inspectors came upon the individual and when they had difficulty reviving him, they called for help. HPD officers and more liquor inspectors came to the scene. After HPD was able to revive him, the individual also stated that his friends were in Scarlet. HLC inspectors determined that they should conduct an inspection[1] of Scarlet's premises, as the passed-out individual was an indication that people may be overserved.[2] There was a confrontation at the door because the inspectors did not show proof of vaccination (which was not required of them). An HPD officer

---

[1] Haw. Rev. Stat. 281-20 provides "Any investigator may, **at all times**, without notice and without any search warrant or other legal process, visit and have immediate access to every part of **the premises of** **every licensee** for the purpose of making **any examination or inspection thereof** or inquiry into the books and records therein, to ascertain whether all of the conditions of the license and all provisions of this chapter are being complied with by the licensee." Thus, the inspectors are not required to have cause to conduct an inspection (although a passed-out person in front of your premises probably provides cause).

[2] A few weeks later, Scarlet was identified by the State of Hawaii Department of Health as a COVID "hotspot" as well.

2011475.1

became involved and Scarlet eventually allowed the HLC inspectors to conduct the inspection, as required by law.

The Treasurer of Scarlet, Joseph Luna (who is not a plaintiff in this case), claims one of the inspectors physically "assaulted" him and a bouncer in the confrontation before the HPD officers got him to consent to the inspection.   Robert Baldwin, another owner of Scarlet, also claims the inspector physically "assaulted" him.   However, both Mr. Luna and Mr. Baldwin later admitted that they did not sustain any injuries, and neither reported any assault to the HPD.   Also, there is not a single witness who saw any assault, including the bouncer who denied ever being assaulted or injured that night by the accused inspector.

Several months later, on October 23 2021, two HLC inspectors responded to a noise[3] complaint at the White Sands Hotel.   While at the White Sands Hotel the

---

[3] The Rules of the Liquor Commission of the City and County of Honolulu provide, in pertinent part:

§3-84.1-78.03. "Entertainment. (a) Entertainment which causes undue noise or disturbs the peace and quiet of the residents or tenants of the neighborhood is prohibited on licensed premises.
(b) Entertainment which causes complaints from the public or reports from the commission's investigators indicating that sounds emanating from the licensed premises cause undue disturbance which disrupts the peace and quiet of the residents or tenants of the neighborhood is prohibited.
(c) Entertainment which causes complaints from the public or reports by the commission's investigators indicating that noise created by patrons departing the premises disturbs residents or tenants of the neighborhood in which the premises are located is prohibited.

inspectors confirmed that the noise level warranted a violation, and also observed a number of violations of the City COVID orders and issued noise and COVID violations to the White Sands Hotel, which is **not** a plaintiff in this case.   White Sands Hotel did not contest the citations and has not sued anyone.   The inspectors issued a 24-hour shut down order to the White Sands Hotel.   The shutdown went into effect at 5:00 p.m., the same time Gay Island Guide's event was advertised and scheduled to end.   Mr. Enriquez dba Gay Island Guide ("GIG") claim the shutdown went into effect at 4:00 p.m. and that "question of fact" will be presented to the court for resolution, if necessary.

---

The Rules define "Undue noise" or "undue disturbance" as "disturbance to the peace and quiet of the residents or tenants of the neighborhood from music, customers, or other noise originating from a licensed premises that is unreasonable. Music, customers, or other noise originating from a licensed premises is unreasonable within the meaning of rule §3-84.1-78.03 if considering the nature and purpose of the licensee's conduct and the circumstances known to the licensee, including the nature and zoning district of the location and the time of the day or night, the licensee's conduct involves a gross deviation from the standard of conduct that a law-abiding citizen conducting the same type of business would follow in the same situation; or the failure to heed the reasonable admonition of a commission investigator that the noise is unreasonable and should be stopped or reduced.

Plaintiffs (as has repeatedly been the case[4]) jumped to the false conclusion

that (1) there was no noise complaint[5]; and (2) the inspectors went to White Sands

Hotel to retaliate against Walter Enriquez and GIG for a story they published online

---

[4] Perhaps the best example of plaintiffs jumping to conclusions is where the plaintiffs observed graffiti painted on a wall that said "Rob is Dead" and plaintiffs jumped to two unsupported conclusions: (1) that of the thousands of persons in Hawaii named Rob, the graffiti was referring to the plaintiffs; and even more ridiculous (2) that the Liquor Commission was creator of the graffiti.   This entire farce played out in a hearing before the Honorable Derrick Watson (Dkt. No. 142):

> Maybe more importantly, though, we have none -- no
> evidence whatsoever that the Rob referenced in the graffiti
> refers to any specific Rob. It is as likely to refer to, no
> doubt, the dozens if not hundreds of Robs who work and/or
> reside in the very same area that the graffiti appeared.
>
> In addition to that, as I tried to address my questions
> at the outset of this hearing, we have zero evidence that even
> if Rob in the graffiti is Robert Sobieralski, as the plaintiffs
> think, we have no way to tie -- there's no evidence in the
> record tying that message to anyone at the Liquor Commission as
> opposed to someone who might have had another disagreement,
> beef, personal dispute, vendetta, et cetera, against this
> particular Rob.
>
> So in the absence of both of those things, I do not know
> how the plaintiffs think they can walk in here and ask me to do
> what I am certainly not about to do. ***To me this motion,
> Mr. DiPasquale, borders on Rule 11 sanctions. That's how poor
> it is. I'm not going to address this motion any further. I'm
> not going to waste my time any more than I already have looking
> at this three-, four-inch stack of garbage***. We're done.

[5] A copy of the noise complaint is on page 48 of Defendant's Exhibit "#D-007".

months earlier repeating Joseph Luna's unsupported allegation that he was "assaulted" when the investigators conducted an inspection of Scarlet's premises. *See, e.g.,* FAC ¶ 38.

These events, led to (1) the filing of this lawsuit; (2) establishing of a web page, where plaintiffs (or those very close to them) have vilified (a) the Liquor Commissioners, causing many of them to resign; (b) the Liquor Commission's counsel and his wife, including publishing on the internet his firm's bills to the City, not only in this case but in every case where Kobayashi Sugita & Goda has represented the City; (3) filed meritless complaints with the Office of Disciplinary Counsel against Lex Smith and other members of Kobayashi Sugita & Goda[6]; (4) conducted a relentless on-line campaign against the HLC inspectors; and (5) repeated communications to the Honolulu City Counsel, and communications to the City administration advocating for the firing of certain Liquor Commission employees.

## PLAINTIFFS' CLAIMS

I.   **Count 1 - Equal Protection (by both Plaintiffs).**

  A.   **Law**

The Equal Protection Clause essentially directs "that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473

---

[6] All of the ODC complaints have now been dismissed.

5

U.S. 432, 439 (1985).  To prove an equal protection violation, the plaintiff must prove (1) disparate impact, and (2) discriminatory intent.  *Rosenbaum v. City & Cnty. of S.F.*, 484 F.3d 1142, 1152–53 (9th Cir. 2007).

To prove disparate impact, "the claimant must show that similarly situated individuals" were not subject to the same treatment.  *Id.* at 1153.  Plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon [plaintiff's] membership in a protected class."  *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013).  To show discriminatory purpose, a plaintiff must establish that "the decision-maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Waite v. United States*, 470 U.S. 598, 610 (1985).

"The first step in equal protection analysis is to identify the [government's] classification of groups."  *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995).  "Once the plaintiff establishes governmental classification, it is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared."  *Id.*  "The goal of identifying a similarly situated class is to isolate the factor allegedly subject to impermissible discrimination. The similarly situated group is the control group."  *Id.* (citations, ellipsis, and quotation marks omitted).

Although a plaintiff need not show that others are identical, it must show that they are similar in all material respects. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011). "Material" means "having some logical connection with the consequential facts," *Wigent v. Sci. Applications Int'l Corp.*, 19 F.Supp.3d 1012, 1035 (D. Haw. 2014). Materiality requires "common-sense" and depends on the facts and circumstances of the case. *Earl*, 658 F.3d at 1114.

Using statistics to establish a disparity is only reliable if the results are statistically significant.[7] The "usefulness of statistical evidence depends to a large extent on the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference drawn." 31A C.J.S. *Evidence* § 311. "Raw statistics are rarely probative of anything." Therefore, courts have held that "statistical evidence is admissible only if the evidence is statistically significant." *Id.*; *see generally Paige v. California*, 233 Fed. Appx. 646, 648 (9th Cir. 2007) (noting that "both parties' experts testified that any disparity above 1.96 standard deviations was indicative of statistical significance.").

Even relatively simple "statistical analysis" must be carefully vetted for statistical significance. *See, e.g.*, *Rodriguez v. Washington Metro. Area Transit Auth.*, No. CV 19-3710 (JEB), 2021 WL 7286936, at *2 (D.D.C. Dec. 7, 2021).

---

[7] Statistical significance is "an indication that a particular result is unlikely due to chance." *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency*, 38 F.4th 34, 48 (9th Cir. 2022).

"Gross statistical disparities" alone can satisfy the intent requirement, but it is a "rare case" where those disparities show an "invidious or discriminatory purpose." *Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009).  In nearly all cases, differential impact alone will not be determinative.  *Id*.  If there is no evidence of intentional discrimination, then the court assumes that the challenged actions were not based on discrimination and must inquire only whether the actions were rationally related to a legitimate governmental interest.  *Hispanic Taco Vendors of Washington v. City of Pasco*, 994 F.2d 676, 680 (9th Cir. 1993).

### B.   **Plaintiffs cannot show disparate impact.**

Plaintiffs claim to meet the requirement of showing "disparate impact" because there are approximately 1,500 liquor licenses in the County of Honolulu and the HLC inspected Scarlet more than 1/1500th of the inspections.  But this claim completely ignores reality.  In fact, Scarlet is inspected, and cited, a comparable number of times to other similarly situated licensees (which are not on the plaintiffs' list of LGBTQ+ oriented businesses).  For example, before the COVID-19 pandemic, in the years 2019 and the first three months of 2020 numerous non-LGBTQ+ licenses within walking distance of Scarlet were inspected a comparable number of times to Scarlet.

**Inspections Before COVID Orders (Jan. 2019 through Mar. 20, 2020)**

| Scarlet | Smith's Union Bar | Hank's Café | Bar 35 |
|---|---|---|---|
| 1/12/2019 | 1/12/2019 | 2/1/2019 | 1/3/2019 |
| 1/18/2019 | 1/19/2019 | 2/27/2019 | 1/3/2019 |
| 3/1/2019 | 3/21/2019 | 3/7/2019 | 1/12/2019 |
| 5/25/2019 | 4/5/2019 | 4/16/2019 | 5/4/2019 |
| 6/22/2019 | 5/4/2019 | 5/15/2019 | 5/18/2019 |
| 8/3/2019 | 5/14/2019 | 6/13/2019 | 6/7/2019 |
| 8/9/2019 | 5/18/2019 | 7/3/2019 | 8/24/2019 |
| 10/12/2019 | 6/7/2019 | 7/31/2019 | 9/6/2019 |
| 10/19/2019 | 6/18/2019 | 9/20/2019 | 9/14/2019 |
| 10/26/2019 | 6/26/2019 | 11/13/2019 | 10/11/2019 |
| 11/22/2019 | 6/28/2019 | 11/15/2019 | 10/19/2019 |
| 11/29/2019 | 7/20/2019 | 12/19/2019 | 12/6/2019 |
| 12/7/2019 | 8/21/2019 | 12/26/2019 | 1/11/2020 |
| 12/20/2019 | 8/24/2019 | 1/28/2020 | 1/25/2020 |
| 1/3/2020 | 8/30/2019 | 2/15/2020 | 2/7/2020 |
| 1/25/2020 | 9/6/2019 | | 2/14/2020 |
| 2/7/2020 | 11/15/2019 | | 3/6/2020 |
| 2/28/2020 | 11/22/2019 | | |
| | 11/30/2019 | | |
| | 12/3/2019 | | |
| | 12/6/2019 | | |
| | 12/7/2019 | | |
| | 1/11/2020 | | |
| | 1/18/2020 | | |
| | 1/22/2020 | | |
| | 1/22/2020 | | |
| | 2/1/2020 | | |
| | 2/6/2020 | | |
| | 2/7/2020 | | |
| | 2/7/2020 | | |
| | 2/12/2020 | | |
| | 2/14/2020 | | |

Attached hereto as Exhibit "A" are pages from Defendant's Exhibit 118 reflecting all of the inspections of Scarlet from January 2019 through March 20, 2020.

Attached hereto as Exhibit "B" are pages from Defendant's Exhibit 118 reflecting all of the inspections of Smith's Union Bar from January 2019 through March 20, 2020.  Smith's Union Bar is approximately a 3-minute walk from Scarlet.

Attached hereto as Exhibit "C" are pages from Defendant's Exhibit 118 reflecting all of the inspections of Hank's Cafe from January 2019 through March 20, 2020.  Hank's Café is approximately a 3-minute walk from Scarlet.

Attached hereto as Exhibit "D" are pages from Defendant's Exhibit 118 reflecting all of the inspections of Bar 35 from January 2019 through March 20, 2020.  Bar 35 is approximately a 4-minute walk from Scarlet.

If you take the number of inspections in the Chinatown area from 2019 through 2022, the statistics are no more indicative of any bias against Scarlet. Focusing on the top 25 most inspected bars and restaurants in Chinatown from 2019 through 2022, Scarlet is **17th.**

**25 Most Inspected Chinatown Liquor Licensees 2019 through 2022**

| Rank | Name | Address | Inspections |
|------|------|---------|-------------|
| 1 | Smith's Union Bar | 19 N. Hotel St. | 71 |
| 2 | Hank's Café Honolulu | 1038 Nuuanu Ave. | 63 |
| 3 | J. Dolan's | 1149 Bethel St. | 50 |
| 4 (tied) | Tiana Café | 60 North Nimitz Hwy | 48 |
|  | Club Boomerang | 1339 Nuuanu Ave. | 48 |
| 6 (tied) | The Nighthawk | 12 South King St. | 47 |
|  | The Beachhouse Sports Bar | 1 Aloha Tower | 47 |
|  | Bar 35 | 35 North Hotel St. | 47 |
| 9 (tied) | Livestock Tavern/Tchin Tchin | 49 North Hotel St. | 44 |
|  | Pho Vietnam | 52 North Hotel St. | 44 |
| 11 (tied) | Fete | 2 North Hotel St. | 41 |
|  | Manifest/Royal Arcade | 32 & 34 North Hotel St. | 41 |
| 13 | Sala Thai | 1333 Nuuanu Ave. | 39 |
| 14 | Next Door Partners | 43 North Hotel St. | 38 |
| 15 | Bar Elixrs | 1153 Bethel St. | 37 |
| 16 | Club Little Saigon | 1802 North Nimitz Hwy | 31 |
| **17** | **Scarlet Honolulu** | **80 South Pauahi St.** | **30** |
| 18 | Smith and King's Bar | 69 North King St. | 28 |
| 19 (tied) | Square Barrels | 1001 Bishop St. | 27 |
|  | Rangoon Burmese Kitchen | 1131 Nuuanu Ave. | 27 |
|  | Encore Saloon/Daley Burger | 10 North Hotel St. | 27 |
| 22 | Beach House Beer Co. | 90 North King St. | 26 |
| 23 | Murphy's Bar & Grill | 2 Merchant St. | 25 |
| 24 (tied) | Maunakea Liquor | 1161 Maunakea St. | 22 |
| 25 | Sin Lounge | 1111 Nuuanu Ave. | 22 |

2011475.1

Focusing on just the 2020-2021 period, Scarlet was tied for **21st** out of the 25 most inspected licensees in Chinatown.

| Rank | Name | Address | Inspections |
|------|------|---------|-------------|
| 1T | Smith's Union Bar | 19 N. Hotel St. | 32 |
| | Hank's Café Honolulu | 1038 Nuuanu Ave. | 32 |
| 3T | Tiana Café and Karaoke | 60 North Nimitz Hwy | 30 |
| | The Nighthawk | 12 South King St. | 30 |
| | Livestock Tavern/Tchin Tchin | 49 North Hotel St. | 30 |
| | Fete | 2 North Hotel St. | 30 |
| 7T | J Dolan's | 1149 Bethel St. | 28 |
| | The Beachhouse Sports Bar | 1 Aloha Tower | 28 |
| | Bar Elixrs | 1153 Bethel St. | 28 |
| 10 | Pho Vietnam | 52 North Hotel St. | 27 |
| 11 | Bar 35 | 35 North Hotel St. | 23 |
| 12T | Club Boomerang | 1339 Nuuanu Ave. | 21 |
| | Manifest/Royal Arcade Bar | 32 & 34 North Hotel St. | 21 |
| 14 | Beach House Beer Co. | 90 North King St. | 20 |
| 15 | Sala Thai | 1333 Nuuanu Ave. | 18 |
| 16 | Next Door Partners | 43 North Hotel St. | 17 |
| 17T | Club Little Saigon | 1802 North Nimitz Hwy | 16 |
| | Square Barrels | 1001 Bishop St. | 16 |
| | Rangoon Burmese Kitchen | 1131 Nuuanu Ave. | 16 |
| 20 | Encore Saloon/Daley Burger | 10 North Hotel St. | 13 |
| 21T | Scarlet Honolulu | 80 South Pauahi St. | 12 |
| | Smith and King's Bar | 69 North King St. | 12 |
| | Opal Thai | 1030 Smith St. | 12 |
| 24 | Murphy's Bar & Grill | 2 Merchant St. | 11 |
| 25T | Long's Drugs #9228 | 1330 Pali Hwy | 10 |
| | Bourbon Street Restaurant | 1055 Alakea St. | 10 |

Scarlet is the only alleged "LGBTQ+ establishment" on the above list.

The basic premise of the Plaintiffs' argument, that Scarlet and other "LGBTQ+ bars" are the subject of discrimination or targeted, is simply not borne

12

out by the data.  Scarlet is inspected around the same number of times as numerous other bars in the same geographic location.

Neither party has any expert, so Defendant submits that it is neither proper nor appropriate for the parties, and the Court, to all appoint themselves amateur statisticians to interpret the data.  However, if the Court elects to delve further into the data, the following appear to be relevant considerations:

1.     **Lack of foundation.**

The assumptions upon which Plaintiffs' base their "statistics" lack foundation. Plaintiffs' entire case hinges on their ability to prove that LGBTQ+ establishments are inspected disproportionately more than non-LGBTQ+ ones.

However, Plaintiffs do not have a witness who is qualified to testify as to what an "LGBTQ+ establishment" is versus a "non-LGBTQ+ establishment."  Those are not terms of art used anywhere in the HLC's licensing process.

Moreover, even if Plaintiffs could clearly define what an "LGBTQ+ establishment" is and what a "non-LGBTQ+ establishment" is, Plaintiffs have no reliable evidence or witness to establish that there are only 7 LGBTQ+ establishments, or that the other 1,493 licensees are "non-LGBTQ+ establishments." **At the final pretrial conference, Plaintiffs' counsel admitted, as he must, that they cannot prove that the other 1,493 licensees are "non-LGBTQ+ establishments."**

13

Simply put, Plaintiffs cannot meet their burden of providing the necessary factual or foundational basis for defining the classifications of groups necessary to establish an equal protection claim.

### 2.   No expert to testify as to statistical significance.

Even if Plaintiffs could show a disparity in the inspection rates between "LGBTQ+ establishments" and "non-LGBTQ+ establishments", Plaintiffs have no expert to testify as to the statistical significance of any such disparity.  For example, in *Rodriguez v. Washington Metro. Area Transit Auth.*, No. CV 19-3710 (JEB), 2021 WL 7286936, at *2 (D.D.C. Dec. 7, 2021), the court granted the defendant's motion in limine to exclude plaintiff's statistical evidence for lack of explanation as to statistical significance.  The court explained, "[a]lthough the numbers cited by Plaintiff are not exceedingly complex, the Court believes that they would be misleading absent context and significance, and [Plaintiff] has never stated which witness — expert or not — could supply this." *Id*.

### 3.   Lack of similarly situated control group.

Not only do Plaintiffs lack a factual basis to establish their proposed control group of "non-LGBTQ+ establishments", but even that group does not consist of establishments that are similarly situated with Scarlet.

Plaintiffs have no evidence that the 1493 "non-LGBTQ+ establishments" were **in fact open and doing business** during the relevant time period (or how long

14

they were open on any given day).  Plaintiffs *assume* that all 1,500 licensees were open, and thus open for inspection, during the same time as Scarlet.  But it is indisputable that many licensees (including Scarlet) closed for "the vast majority" of 2020 and 2021 due to COVID.

Plaintiffs also fail to control for license class.  In <u>Freeman v. City of Santa Ana</u>, 68 F.3d 1180, 1187 (9th Cir. 1995), the owner of a bar, The Red Turtle, brought an equal protection claim against the City of Santa Ana.  The plaintiff defined her class as "Mexican immigrant bars," regardless of license type, and defined the similarly situated control group as "non-Mexican immigrant bars." *Freeman*, 68 F.3d at 1187.  However, the court took issue with plaintiff's proposed control group, and determined that for purposes of defining the similarly situated class, the plaintiff "could only introduce evidence of premises with the *same license type* as The Red Turtle." *Id.* at 1187-88.

### 4. **Other factors**.

Plaintiffs also fail to account for nondiscriminatory explanations.  For example, they fail to control for the number of complaints that the HLC received from the public with respect to a given licensee.  A higher number of complaints leads to a higher number of inspections by the HLC.  They fail to control for location density (inspectors tend to focus on higher-density areas, such as Chinatown and

Waikiki), and occupancy (if an establishment was "dead", there was less of a need to inspect it).

In short, there are just too many variables (and possibly more than are even mentioned here) to make a valid statistical analysis without an expert statistician to design the proper controls for such a study. Plaintiff has no such expert. Without context or significance, Plaintiffs cannot meet their burden of proof that their purported statistics show actionable discrimination.

C.   **Plaintiffs cannot show intent to discriminate.**

There are no statistics showing a "stark" difference between the frequency with which Scarlet was inspected and the way other similarly situated licensees were inspected. Moreover, any alleged (and denied) utterances about LGBTQ+ individuals are not connected to any conduct on the part of any HLC employee in relation to Plaintiffs.

As the previous discussion confirms, Plaintiffs cannot even show disparate impact, much less deliberate discrimination. There simply is none.

1.   **Plaintiffs' friend, client and witness, Jhumar Ray Waite.**

Jhumar Ray Waite is suing the HLC for allegedly maintaining a hostile environment and harassing him allegedly because he is gay and/or Filipino. Mr. Waite's lawyer is the same lawyer who represents the plaintiffs in this case. *Waite v. Honolulu Liquor Commission et al.*, Case 1:23-cv-00356-MWJS-RT. As the

2011475.1

plaintiff in his own lawsuit against the HLC, Mr. Waite obviously has an interest in the outcome of this case. He will testify about a litany of events which have one thing in common: none were observed or corroborated by any witness and all are denied by the people he accuses. Mr. Waite's uncorroborated testimony about his own claims against the HLC does not provide any support for any of the Plaintiffs' claims in this case.

## II.     **Count 2 - Due Process (by Walter Enriquez dba GIG).**

GIG claims that it was deprived of procedural due process on October 23, 2021 when the HLC (1) inspected the White Sands Hotel (again, not a plaintiff) on the false pretense that there was a noise violation, and (2) issued a 24-hour shut down notice to the White Sands Hotel (not to GIG). *See* FAC ¶ 100.

GIG's event at White Sands Hotel was scheduled to end at 5:00 p.m. Plaintiffs claim the shutdown order went into effect at 4:00 p.m., while the HLC says it did not go into effect until 5:00 p.m.:

> Gay Island Guide has a protected property interest in the gay pride event it sponsored, organized and ran at the White Sands Hotel which was attended by members of the LGBTQ+ community. Patrons paid for tickets to the event and enjoyed drinks and entertainment at the event. Shutting down the event hours prior to the scheduled close of the event without warning, notice or any ability for Gay Island Guide to be heard on the premature termination of the event caused Gay Island Guide injury.

FAC ¶ 101.

Although the 24-hour shutdown order was issued to White Sands Hotel (which is not making any claim in this case) Mr. Enriquez/GIG (who do not hold a liquor license and were never ordered by the HLC to do anything) claim the order to White Sands Hotel violated **their** procedural due process rights to continue their party until its scheduled termination at 5:00 p.m.

There is simply no evidence that the HLC investigators inspected White Sands Hotel unlawfully or on false pretenses.  To the contrary, the HLC had the right to inspect the White Sands Hotel, which is a licensee of the HLC, and the inspection was in direct response to a noise complaint.

Similarly, there is no evidence that the HLC's issuance of a noise violation to White Sands Hotel was done as a result of, or was in any way motivated by, a prejudice against GIG or the LGBTQ+ community.  To the contrary, the noise violation was issued because the HLC inspectors confirmed that the noise level of the music playing at the pool party warranted a noise violation.  The White Sands Hotel also plead "no contest" with respect to the noise violation.

Further, there is no evidence that the issuance of a 24-hour shut down to the White Sands Hotel was done as a result of, or was in any way motivated by, a prejudice against GIG or the LGBTQ+ community.  To the contrary, the 24-hour shut down was issued because the HLC investigators observed numerous violations of Emergency Order No. 2021-14 at the Pool Party, including employees not

wearing masks, customers intermingling and not practicing social distancing, customers not wearing a mask while not actively eating or drinking, and the venue operating a standing bar area.

To show a violation of procedural due process, a plaintiff must establish the existence of "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Guatay Christian Fellowship v. Cnty. of S.D.*, 670 F.3d 957, 983 (9th Cir. 2011).

### A.    Enriquez/GIG Do Not Have A Protected Property Interest In White Sands Hotel's Liquor License; Especially When White Sands Hotel Has Violated State And County Regulations.

White Sands Hotel holds a liquor license. Sales of liquor is a highly regulated industry and all sellers of liquor are required to comply with government regulations, which change from time to time. In *California Ass'n for Pres. of Gamefowl v. Stanislaus Cnty.*, 2023 WL 1869010 (E.D. Cal. Feb. 9, 2023), the court rejected a claim that a zoning ordinance prohibiting ownership of roosters by anyone other than a commercial farmer effected a denial of procedural due process. The court held there was no liberty or property right to be free of such a zoning regulation, and that the procedures for enactment of zoning legislation were sufficient.

Similarly, in *Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886 (1961), a cook at a cafeteria on a naval base was denied security clearance necessary to continue working at the naval base. Her due process

claim was rejected because she remained free to work anywhere, including at a different restaurant operated by the same employer, not on a naval base:

> Brawner remained entirely free to obtain employment as a short-order cook or to get any other job, either with M & M or with any other employer. All that was denied her was the opportunity to work at one isolated and specific military installation.

367 U.S. at 896.

Like the zoning ordinance in the *Gamefowl* case, the State and County COVID orders imposed upon liquor-licensees (not Mr. Enriquez or Gay Island Guide) additional obligations, and contained consequences (possible 24-hour shut-down) if the orders' requirements (such as social distancing) were not followed.  White Sands Hotel did not contest its violations of the COVID orders that led to the 24-hour shutdown.  Mr. Enriquez/GIG did not have a property interest in White Sands Hotel's liquor license.

Like the worker in *McElroy*, the 24-hour shutdown applied to only one licensee, the White Sands Hotel.  Mr. Enriquez/GIG remained free to go to any other hotel or bar. The shut-down order did not prevent Enriquez and Gay Island Guide from going to any other licensee that was open for business.  Accordingly, Mr. Enriquez and GIG did not have a property interest in White Sands Hotel's liquor license.

B.     **Enriquez/GIG was Not Deprived of a Protectable Property Interest**

Even if Mr. Enriquez/GIG had a property interest in White Sands Hotel's liquor license, the HLC did not take it.   The evidence will clearly show that the shutdown did not begin until 5:00 p.m., the scheduled ending time of the GIG event.

C.     *Monell v. New York Dept. of Social Services*

Even if the Plaintiffs could successfully prove that they were deprived of their civil rights, they cannot recover against the HLC unless they additionally prove that the violation of their rights occurred "when execution of a government's policy or custom ... inflicts the injury." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).   In other words, even if Plaintiffs established that they had been deprived of a constitutional right, they would have to additionally prove that the deprivation of the right was the result of a policy or custom of the HLC or failure to train employees.   *Rodriguez v. Cnty. of L.A.*, 891 F.3d 776, 802–03 (9th Cir. 2018).[8]

Moreover, Plaintiffs are required to prove causation.   That is, Plaintiffs must prove that the custom, practice or failure to train was the **cause** of the plaintiff being deprived of a constitutional right: "[T]here must be a **"direct causal link between a municipal policy or custom and the alleged constitutional deprivation."**

---

[8] The court has already rejected plaintiffs' claims to the extent they are based on the assertion of an unconstitutional formal policy and/or ratification of unconstitutional conduct. (Dkt. No. 132, page 2).

21

*Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (quoting

*City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

It is anticipated that in order to prove this requirement, Plaintiffs will rely on

(1) their claim of a disparity in number of inspections of LGBTQ+ licensees (which

does not exist); and (2) the fact that the Plaintiffs' (and Mr. Waite's) complaints were

not sustained.  In fact, the HLC will show there is no anti-gay policy or custom at

the city, and none of Plaintiffs' "evidence" suggests that there is.  Moreover, while

several liquor commission employees have testified that the training they received

was not good, the evidence will show that the training the officers received did not

cause any violation of the Plaintiffs' rights.

III.   **Count 3 – HRS § 489-3.**

"The purpose of [Chapter 489] is to protect the interests, rights, and privileges

of all persons within the State with regard to **access** and **use** of public

accommodations by prohibiting unfair discrimination."  HRS § 489-1.

"Unfair discriminatory practices that deny, or attempt to deny, a person the

full and equal enjoyment of the **goods**, **services**, **facilities**, **privileges**, **advantages**,

and **accommodations** of a **place** of public accommodation on the basis of race; sex;

including gender identity or expression; sexual orientation; color; religion; ancestry;

or disability, including the use of a service animal, are prohibited."  HRS § 489-3.

A place of public accommodation is defined as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the general public as customers, clients, or visitors."  HRS § 489-2.

Scarlet is the only place of public accommodation alleged in this case.  *See* FAC ¶ 109.

In order to prove a violation of HRS § 489-3, Plaintiffs must show that the HLC engaged discriminatory practices that denied Plaintiffs the full and equal enjoyment of Scarlet on the basis of their identity as LGBTQ+.  This claim makes no sense.

Plaintiffs do not allege that the HLC denied Scarlet or GIG the full and equal enjoyment of Scarlet.

Plaintiffs also claim that the HLC denied Plaintiffs "the right to full and equal enjoyment of **the rights and privileges to operate**."  *See* FAC ¶ 110).  But contrary to their contention, the plain language of the statute has nothing to do with Scarlet's right to operate as a business.  Rather, Chapter 489 prohibits unfair discrimination in public accommodations on the basis of sexual orientation.  *See* HRS § 489-1; 2006 Hawaii Laws Act 76 (H.B. 1233) ("The purpose of this Act is to make state civil rights laws uniform by prohibiting discriminatory practices in public

23

accommodations on the basis of sexual orientation."). Simply put, the statute protects a person's right to be free from unfair discrimination *in* a place of public accommodation, but it has nothing to do with the place of public accommodation's right to be in business.

Plaintiffs further claim that the HLC's actions "disproportionally and adversely impact *LGBTQ+ persons* who have a right to enjoy the services provided by the Plaintiffs' businesses." *See* FAC ¶ 112 (emphasis added).

Plaintiffs lack standing to assert claims on behalf of such non-parties. Even if they had standing, no one disputes that LGBTQ+ persons have a right to equal enjoyment of the services provided by Scarlet. There is simply no evidence, and none will be introduced at this trial, to show that any HLC employee ever did anything to prevent any Scarlet customer from enjoying Scarlet. Nor is there any evidence that the HLC denied LGBTQ+ customers equal enjoyment of Scarlet compared to non-LGBTQ+ customers.

## IV.   **Count 4 - Negligent Training, Supervision and Retention.**

To prove a claim of negligent retention, a plaintiff must show: "(1) Defendant owed a duty of care to the Plaintiff; (2) Defendant breached that duty by … retaining an employee even though Defendant knew, or should have known, of the employee's dangerous propensities; (3) the Plaintiff suffered monetarily compensable **physical or emotional injuries**; and, (4) the breach of the duty was the proximate cause of

Plaintiff's **physical or emotional injuries**." *Scarlet Honolulu, Inc. v. Honolulu Liquor Comm'n*, No. 21-CV-00457-DKW-KJM, 2023 WL 4968011, at *14 (D. Haw. Aug. 3, 2023) (emphasis added) (quoting *Murphy v. Lovin*, 128 Hawai`i 145, 155, 284 P.3d 918, 928 (App. 2011)).

Scarlet is a corporation.   Corporations do not incur physical or emotional injuries.   Scarlet's claims under Count 4 make no sense and cannot be proven.

Likewise, Mr. Enriquez dba GIG doed not allege that he sustained any physical or emotional injury due to the HLC.   And there is no such evidence.

The Court has already granted summary judgment in favor of the defendant on the claim that any HLC employee had, at the time they were hired, known propensities to inflict physical or emotional injuries.   Although the court did not grant summary judgment on negligent retention, there is no evidence that the HLC ever became aware that any of its employees had any tendency to inflict physical or emotional injuries on people.   More importantly, there is no evidence that any HLC employee ever inflicted physical or emotional injuries any Plaintiff.

A negligent training claim is a subset of a negligent supervision claim, and not a separate cause of action.   *See Yoshikawa v. City & Cnty. of Honolulu*, No. CV 18-00162 JAO-RT, 2021 WL 54363, at *13 (D. Haw. Jan. 6, 2021).

"The Hawai'i Supreme Court has made it clear that 'negligent supervision may only be found where an employee is acting *outside* of the scope of his or her

employment.'"   *Vargas*, 2020 WL 3547941, at *22 (quoting *Pulawa v. GTE Hawaiian Tel*, 112 Hawai'i 3, 18, 143 P.3d 1205, 1220 (2006)); *see also Yoshikawa v. City & Cnty. of Honolulu*, No. CV 18-00162 JAO-RT, 2021 WL 54363, at *13 (D. Haw. Jan. 6, 2021) ("there can only be a negligent supervision claim arising out of an employee's misconduct when the employee's misconduct occurred *outside* the scope of his or her employment.").

However, it is clear from the FAC that Plaintiffs allege that they were injured by the conduct of HLC investigators that occurred **within** the scope of their employment.  First, Scarlet claims it was injured on the evening of July 16, 2021 by the HLC investigators "while conducting an unannounced inspection of Scarlet."  *See* FAC ¶ 28.  It is indisputable that the HLC was authorized to conduct an unannounced inspection of Scarlet that evening.  Scarlet does not allege that it was harmed by the conduct of HLC investigators that occurred outside the scope of their employment.

Second, GIG claims it was injured, on the evening of October 23, 2021, by the HLC investigators' efforts to enforce the Rules of the Honolulu Liquor Commission and COVID-19 Emergency Orders.  On that evening, the HLC investigators responded to a noise complaint from a member of the public, which was their job to do.  GIG does not allege that it was harmed by the conduct of HLC investigators that occurred outside the scope of their employment.

V.   **Damages**

The major element of damages Plaintiffs wish to claim is "lost profits." However, Plaintiffs' complaint does not mention any lost profits. Although Plaintiffs moved for, and were granted, leave to amend their complaint, the FAC also does not allege any lost profits. Plaintiffs never sought leave to further amend their complaint to allege lost profits.

Long after the deadline to amend pleadings had passed, Plaintiffs served a "supplemental preliminary disclosure" alleging lost profits but (1) a preliminary disclosure cannot supersede a plaintiff's pleading, particularly long after the deadline to amend pleadings had passed; and (2) the supplemental disclosure served by the Plaintiffs violates Rule 26 because it contains no explanation of the computation of the claimed damages. The supplemental disclosure was served after Defendant's deadline to name an expert witness passed, so Defendant had no opportunity to have the claim scrutinized by an expert. Plaintiffs' complaint and initial disclosure did not give fair notice of any claim or computation of lost profits. It is not the HLC's burden to figure out that which Plaintiffs' failed to provide.

Plaintiffs admit that they failed to give the HLC a computation of alleged lost profits **until the eve of trial**. Such a belated disclosure is deficient and would unfairly prejudice the HLC. If Plaintiffs provided such a computation of alleged lost profits in a timely manner, the HLC would have been able to conduct necessary

discovery, including in consultation with an expert, and prepare its defense accordingly.  That ship has sailed.

Importantly, Scarlet's own complaint directly contradicts any claim that it "lost profits" in 2020-2021 due to the HLC.  Specifically, Plaintiffs admit that Scarlet was **closed for the vast majority of 2020 and 2021 due to the COVID orders** (not due to the HLC):

> 42.    Due to the emergency orders shutting down nightlife operations within the State of Hawaii, Scarlet was closed for the vast majority of 2020 and 2021.

FAC ¶ 42.

Moreover, Plaintiffs admit that they **closed on August 9, 2021 and remained closed through the end of the year due to the COVID orders**.

> 60.    On August 9, 2021 Scarlet closed again in response to the Governor's COVID-19 emergency order. The nightclub remains closed. Further, Gay Island Guide paused events due to the Governor's emergency COVID-19 order.

FAC ¶ 60.

These admissions directly contradict thier belated claim that they suffered lost profits at the hands of the HLC.

Plaintiffs cannot run from thier own pleadings.  *Hakopian v. Mukasey*, 551 F.3d 843, 846 (9th Cir. 2008) ("Allegations in a complaint are considered judicial admissions.").

The answer to the question of "**who should bear the harm**" caused by Plaintiffs' failure to allege lost profits is simple: Plaintiffs.  Not only were Plaintiffs the ones who failed to make the disclosure in the first place, but a claim for lost profits is clearly inconsistent with Plaintiffs' own judicial admissions in this very case.

 This is not, as Plaintiffs urge, a mere technicality that can be "fixed" through a bifurcation of the trial – fairness and equitable principles such as judicial estoppel bar Plaintiffs from taking such a clearly inconsistent position at the eleventh hour. *Grondal v. United States*, 21 F.4th 1140, 1151 (9th Cir. 2021) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position.").

Although the HLC ordered certain licensees to shut down for 24 hours due to COVID violations, Plaintiff Scarlet **never** received such an order.  At no time did HLC ever order Scarlet to shut down at all, even for one minute.

The records show that the inspections of Scarlet in 2020, lasted as little as five minutes and no longer than 30 minutes.  It is preposterous for Scarlet to claim that these brief inspections caused Scarlet to close down its business for 65 months.

| Date | From | To | Duration of inspection |
|------|------|-----|------------------------|
| 1/3/2020 | 1:42 a.m. | 1:56 a.m. | 14 minutes |

| | | | |
|---|---|---|---|
| 1/25/2020 | 11:23 p.m. | 11:53 a.m. | 30 minutes |
| 2/7/2020 | 2:08 a.m. | 2:08 a.m. | 0 minutes |
| 2/28/2020 | 11:08 p.m. | 11:18 p.m. | 10 minutes |
| 6/20/2020 | 11:45 p.m. | 11:58 p.m. | 13 minutes |
| 7/3/2020 | 11:05 p.m. | 11:10 p.m. | 5 minutes |
| 7/10/2020 | 12:52 a.m. | 1:11 a.m. | 19 minutes |

Plaintiffs in a Section 1983 action like this have a duty to mitigate damages. They cannot, on the basis of these brief inspections (even if there was something wrong with them, which there wasn't) merely shut their business for over a year and then expect the HLC to pay them for the entire time they were closed, when the HLC never closed their business at all.

Lastly, while the COVID orders were in effect, Plaintiffs' emails to the City admit that the COVID orders prevented them from opening.

For example, on September 25, 2020, Joseph Luna, an owner of Scarlet, emailed the HLC recognizing that all bars (including Scarlet) were closed indefinitely due to COVID orders (not the HLC):

> I would like to make a request for Scarlet Honolulu (license E1407) to delay our annual payment on our Gross Liquor Sales report an additional 90 days, from the current due date of 10/31/20 to 01/31/21. **Per Mayor Caldwell's** most recent "tiered" plan launch and press conference, **all bars will remain closed** at a bare minimum of 12 weeks

(4 week each for 3 tiers), and, even then, in Tier 4, opening bars remains "TBD."

We do not foresee that we will be allowed to open any earlier than the end of December, and it may be even longer, which we can address with the Liquor Commission **if reopening dates continue to be delayed by the Mayor's Office**.

See Defendant's Exhibit #D-050 (emphasis).

On March 24, 2021, Joseph Luna, emailed to the HLC that Scarlet was still closed because of the COVID orders:

> I would like to make a request for Scarlet Honolulu (License E1407) to delay our annual payment on our Gross Liquor Sales report for 2020 for an additional 60 days from April 1, 2021 to June 1, 2021. We are currently under an existing extension and **are awaiting news from the City & County that dance/nightlife venues will be allowed to reopen**.

See Defendant's Exhibit #D-051 (emphasis).

On May 18, 2021, Scarlet's Treasurer again confirmed that Scarlet was still closed because of the COVID order:

> I would like to submit another request for Scarlet Honolulu (License E1407) to delay our annual payment on our Gross Liquor Sales report for 2020 for an additional 60 days from June 1, 2021 to August 1, 2021. **We are still awaiting news from Governor Ige and the City & County that dance / nightlife venues will be allowed to reopen**.

See Defendant's Exhibit #D-052 (emphasis).

31

## VI.   **Conclusion**

HLC does not discriminate.  The data does not show a disparity in the number of times Scarlet was inspected.  The "statistics" upon which Plaintiffs' case hinges are unreliable, and even then, do not show discrimination.  HLC does not have any policy of discrimination.  Plaintiffs' historical recitation of general problems within the HLC   Judgment should be entered in favor of HLC and against the plaintiffs on all counts.

Dated: Honolulu, Hawaii, September 16, 2024.

/s/ Lex R. Smith
LEX R. SMITH
AARON R. MUN
ZACHARY K. SHIKADA

Counsel for Defendant
HONOLULU LIQUOR COMMISSION